on behalf of Mr. Nava. As I'm sure the Court is aware, the Melina Tarazan issue was submitted to the Supreme Court last week, and I'd like to use this limited time today to address the issue of the arrest. In particular, to be frank with the Court, I'm somewhat befuddled by the Court's decision in Hernandez, and more specifically, the government's argument that under Hernandez, handcuffing at the border is somehow per se permissible without any attempt to attenuate what a reasonable person in that situation would believe, which is that that person is under arrest. Well, he's not free to go. I mean, there's no dispute about the fact that he just couldn't take off and say, I'm not sticking around, right? That's correct. And at the border, the specific test is whether a reasonable person in that individual's position would believe that they're being subjected to more than temporary detention occasioned by border-crossing formalities. And to suggest that handcuffing that individual, which I believe this Court, as well as other circuits, vindicated as one of the most traditional indicia of arrest, being handcuffed here, being taken out of your car before you even got to the primary booth, the area where you're normally questioned and momentarily stopped. Do you agree they can take him out of the car or ask him to get out of the car? They can't ask him to get out of the car, sir. Do you agree that they can keep him from leaving? Yes. Well, as this Court has said, there's certainly a spectrum, a twilight zone, between  So they can make him get out of the car, they can tell him he can't go, right, until they're done searching the car, right? That's very helpful to tell them that they're searching the car, which did not occur in this case. Well, I'm not saying they have to tell him, but I mean, play along with me for a second. They have the right to have him get out of the car, right? They can make him get out of the car, yes. They have the right to tell him, you're not going anywhere until we search the car? Yes, they can tell them that. In fact, they can do that, make him stay there until they search the car. And it would depend on what sort of search occurred, what, how, the manner in which they told him. The difficulty I'm having in answering your question, sorry, is that they can take him to the... Next time you come here, you're going to have to bring another lawyer to make objections to leading questions. They can take him, they can take him to the security office, right? They can do numerous things at the board. The question is what the person would believe has happened to him. You don't want to answer the questions, that's okay, because then it's not going to help me out. No, yes, they can. They can take him to the security office. Okay. And in the security office, they can lock them there until they're done, isn't that right? Until they're done with the search? Lock them in the security office until they're done with the search, without that person believing that he is under arrest? What he believes, I don't know, but they can bring him into the security office and make him stay there until they're done. That's the difficulty with the test we come with from Bravo. The court there chose to adopt the test which looks from the perspective of the person being detained. What does that person reasonably believe is occurring? Is he being temporarily detained? Well, a reasonable person would believe it's a temporary detention if they're told we're going to search your car, we're going to search your bags, we're going to do a search that takes several hours in this case because we have to call in a contractor to drop the gas tank. That's the test that the court adopted. Now the questions you're asking come from another perspective I believe that's best articulated by Judge Paez in his dissent. What justifies the actions that the government can engage in at the border? Based on the degree of suspicion, the officers can do a lot of things. They can lock you in the room, they can handcuff you, they can strip search you, they can take your car apart. A lot of things can be done if they have the justification, but that's not the test adopted in Bravo. That's not the test that Hernandez purported to rely on. The test was what a reasonable person would believe was happening and looking at the facts of this case, taking fact piecemeal by piecemeal isn't very helpful, certainly it's the totality of the circumstances. And in this case, the totality of the circumstances was that an individual was removed from his car after being fully compliant with all the officer's questions. He was handcuffed in the pre-primary area and led away from his car. Exactly what was illegal about that? Well our position is that that was done without the justifiable suspicion that's required. The dog alerted on the car? Well there's the elephant in the courtroom that the government didn't rely on below, that the court specifically precluded me from attempting to get into below. I made the motions for dog discovery, Sedano, Arellano, clearly in the case... Whether the judge allowed you to do it or not, the fact is the dog alerted on the car, I mean that's a fact in the record, right? That's a fact in the record, but if this court was to rely... Dog didn't do duty, so to speak, D-U-T-Y, I mean alerted on the car, and your guy is nervous and on that basis they had him get out of the car. Is that what the record shows? Well what the record shows is that they relied on nervousness alone to justify their actions. And we know that... Where did I get the business about the dog? That didn't happen? The agent testified that a dog alerted, not his dog, and the court specifically did not rely on that basis. On numerous occasions I asked the court to inquire into that basis. The dog's handler actually was present outside of the courtroom that day. And if this court is going to rely on the dog's alert, there are several problems. The first is that no reliability was established. The second is this court would have to recognize the district court's error under Sedano, and for that reason at least remand so they have an opportunity to develop whether that dog's alert, whether it in fact alerted, whether that dog was reliable. And finally, the court would have to remand if it intends to rely on the dog so that I can cross-examine the handler on that issue. The court below kind of went off on the idea that he was nervous. They had grounds to at least start to do some searches. Isn't this the one where someone taps on the gas tank and then when they do that it makes the sound like it's not empty? That makes the sound that in their experience suggests we've got to search this gas tank. Those were the facts in this case, Judge Gould. My concern is that the tapping on the gas tank and subsequent suspicion that the government claims they developed to justify dropping the tank occurred in a vacuum that Mr. Nava was not aware of. All he was aware of is that long before anyone tapped on the tank or gained any suspicion of whether in fact that was suspicion, that he was handcuffed, he was taken away from his vehicle, he was patted down. His wallet, keys and ID were not returned to him. They were removed and not given back to him during the entire duration of his detention. So your view of the case is that it sort of turns on whether the government had to tell him we're only holding you until we do this search, we're not arresting you. Under Bravo. If you find anything in your car you'll be free to go afterwards. Under Bravo I believe the government had to do at least that or something similar to that to dispel the obvious implication to a reasonable person that they were under arrest and being detained without any end in sight. If the government doesn't do that, then you think a reasonable person could think they were under arrest and if there's not probable cause to arrest, then you prevail. That's correct, Your Honor. I think I understand that theory. If I can reserve the remaining time for rebuttal, I'd appreciate that. Thank you. Good morning. Good morning, Your Honors. May it please the Court, Patrick O'Toole on behalf of the United States. Judge Gould, your last question to defense counsel where you said that the defense would prevail if all these things were required and they weren't done. Well, subject to maybe some other issues, but this theory is, as I understood it, that if he's arrested without probable cause, then he's got some ground to suppress. I agree, Your Honor. I just didn't want the Court to foreclose the government's argument, which I think is frankly the most important argument that we're here on, the independent intervening probable cause. My comment didn't mean that. Okay. I just suggest that that issue isn't a valid issue. Thank you, Your Honor. Your Honor, I'm going to argue this case a particular way because I think it's not only easier for the Court. I think it's better for this recurring fact situation that occurs at the border. There's no doubt, and the defendant would basically have to concede, that the physical evidence that was seized in this case was admissible, the marijuana. Even apart from the routine, non-routine distinction of what the Supreme Court is going to do with Melina Terrazon, there was ample reasonable suspicion for this non-routine gas tank search. It really can't be contended. So the physical evidence exists. It's only after the discovery of that physical evidence that the agents go back, arrest the defendant, advise him of his Miranda rights, and interview him. Even if you think, and I suggest to you, it was not an illegal arrest before, but even if the Court thinks that there was an illegal arrest before or an illegal detention, under the United States v. Manuel, the initial illegality would be, the purge from that would be purged by the subsequent probable cause. And that's... You're saying, if they have grounds to look at the gas tank, and then they find drugs in the gas tank, then they have grounds to arrest him based on that? Absolutely. And so if he says something after that, any taint from an initial unlawful arrest, if it was unlawful? That's correct. And the reason that that is so important is we have this recurring fact situation at the border. And Judge Silverman, I believe, in the Cedeno case, you were on the panel. I argued the case. I argued independent intervening probable cause. Both in the Cedeno case, published opinion, and in the Bravo case, which I also argued, the panel specifically did not decide the independent intervening probable cause. They ultimately didn't have to because there were other grounds that they could decide the case. I know of at least six cases where this argument has been made before this Court, two published opinions, four other times the argument's been made. And we get back to the district court, week in, week out, same fact situation, same arguments before the Court. The government says that Manuel controls this given issue. The defense says Manuel is distinguishable, or it should be overruled, or it's in conflict with Taylor v. Alabama, and a lot of time is spent in a very important issue. And I'm not saying that abstractly it's important in this particular case because it would make this panel not have to decide the arrest attention issue to begin with. Because the government does not suggest that we can handcuff everybody who comes across the border, period. Bravo was my case, and the position in Bravo was, in effect, that when we handcuff somebody, it's not an arrest because it's not just a reasonable person test, it's a reasonable innocent person. What would a reasonable innocent person think under the circumstances when he's taken out of his car, when he's walked over to the security office, when he's kept in the security office pending the results of the search? But the handcuffing distinguishes a routine detention from a non-routine detention. And under the Bravo case, and I submit to you that that is the law in this circuit, the government must have reasonable suspicion in order to handcuff somebody at the border. I have a hard time conceptualizing a difference between handcuffing somebody and locking him in the security office. I mean, what's the difference? What's the difference which way? I mean, the government can... It seems to me odd to argue, or by either side to argue, that okay, you can take him to the security office where he can't get out, he's locked in. And that somehow is okay, but he can't be handcuffed for the two minutes while he's being walked over there. Well, I think Your Honor just hit the nail on the head. The critical distinction in these handcuffing cases at the border is that somebody is always temporarily handcuffed. In other words, what happens is they're handcuffed from when they're locked from point A to point B. In Bravo, I think they were handcuffed between one and two minutes. In this case, they were handcuffed between two and three minutes. And it's also not the case that the person wasn't told anything, that he was left in the dark. He was specifically told that he was being handcuffed in his ER 4142, and Judge Lorenz made a specific finding in this regard in ER 7475. He was told that he was being handcuffed for safety reasons and being escorted to the security office. And the inspector also said that he tells people this because he wants to allay their suspicions and not have them think that they're under arrest. Now whether he specifically told them in this instance that he was not under arrest or not is not specified in the record, that's just a standard practice. I would agree with Your Honor. I think if somebody, if the government can keep somebody detained during the search, handcuffing is not that much different. But under the Bravo case, in this panel, this Court does not, you know, write in a clean slate. The Court said that it aggravates the situation, handcuffing, and handcuffing is a traditional hallmark of arrest. It doesn't necessarily make an arrest, but it is intrusive, and the government conceded that we could not handcuff and would not handcuff everybody crossing the border, that we needed some level of suspicion to justify the handcuffing. And where this case is difficult and where you have the interplay between Bravo and Cedeno-Ariano is the district court judge did not rely on the dog alert. The government did in its papers. District court judge did not rely on the dog alert. He thought that the nervousness was sufficient for reasonable suspicion. Normally, nervousness itself, even at the border, is not sufficient for reasonable suspicion, and the government's in a position under Cedeno-Ariano, which we disagree with the decision, but it is binding law in this panel, it has not been reheard, and it is the law. We cannot rely on the dog for reasonable suspicion unless we provide dog discovery. Now, this case is a little bit different from dog discovery, I'm sorry, this case is a little bit different from Cedeno-Ariano because the government did give the drug detector dog certification memorandum. That was provided in this case, which was not provided in Cedeno-Ariano, but it's not the case that we fully complied with all the discovery that would be required under Cedeno-Ariano, and normally we would need to do that for the dog alert to count. One approach would be, I think what Appellant suggested, I don't think this is the government's ideal approach, but that we remand it so that any issues relating to the dog could be explored. The reason why that wouldn't make sense. I realize you sort of prefer, as I understand your argument, that we say even if there's a problem with the initial handcuffing, or it became an arrest from his point of view, that there's an independent ground, there's adequate ground for them to search the tank, and once they find the drugs, then any problem is dissipated. That's correct, and it's very important in this case to remember that during the time that he's handcuffed, that two minutes, the government doesn't talk to him, we don't take any statements, we don't find any evidence on his person, and that there was no connection really between the temporary handcuffing and the decision to search that vehicle and to find the drugs. But the other reason why the remand really wouldn't work is, which the government did not advance this in Sedona and Arellano, but the government has law enforcement sensitivity concerns in regard to the full import of Sedona and Arellano with providing training manuals for how dogs work, what they alert on, how we train them, things of that nature. That's just, I think, a great over-reading of Sedona and Arellano. That wasn't what our panel intended. Thank you very much, Your Honor. I appreciate hearing that, because I'm down in District Court and we argue... Judge Silverman doesn't get any better right to say what that opinion is. No, I agree. The mayor, I do. I could recall... I mean, it's not even in there. It's not even in the opinion. I could recall Judge Silverman's comment that Sedona and Arellano was argued by two people. I argued a different issue, and he said that the other attorney had the more difficult issue, which was the dog discovery issue. But we do think, the government does submit, Your Honors, that the independent and the improbable cause issue is an important issue for which the District Court deserves guidance.    We're up here with you. We're up here with you. We're up here with you. We're up here with you. I think I understand you'd like us to reach to that issue. Thank you very much. Thank you, Mr. Tung. Mr. Johnson? Mr. Johnson, I'd really appreciate hearing from you, in particular, on the question, why... Is there any reason we shouldn't go to the issue of there's an... There are independent grounds to, or adequate grounds to search the tank, and once they do, why doesn't that dissipate any intent from any assumed initial overreaching or illegal arrest? Well, in order to prevail, Your Honor, assuming the court agrees either there was an adequate suspicion, which the government concedes there needs to be reasonable suspicion, or probable cause that they see this as rising to the level of an arrest under Bravo, we do need to address this issue. I've briefed it in my reply brief. I wanted to hear from you, kind of eyeball to eyeball. Let's assume we say that it was an arrest under this Bravo case, but then what's the best thing you can say for your client to say why we shouldn't accept the government's argument that, okay, so it was wrong, but they found the drugs, and at that point, it becomes right? Well, there are a number... There is authority to search, but the court should understand that the search and the detention that allowed them to conduct the search can't just be separated, and I think Manuel needs to be understood as an outlier, and it's problematic in several senses. One is that it didn't discuss the most relevant recent Supreme Court opinion that came out about a year before that case was published. Whether that was oversight or trouble with reconciling that opinion is irrelevant. The point is, Taylor exists, and this court, to adopt the government's theory of intervening circumstances, would have to deal with Taylor, but Taylor's very instructive, and I ask this court to read it carefully, because the state, in that case, offered several things they thought would be intervening circumstances, that they thought would purge the taint of an illegal arrest, and one of them was, and both of the things that they offered help us understand better what they meant by intervening circumstances. The Supreme Court never meant intervening probable cause. The dissenting justices had an opportunity to address that theory. They didn't even address it. What Taylor talks about, and what Brown and Dunaway, and all the intervening circumstances cases talk about, is something that would make the individual's statements more an act of free will. That's been repeated by this Court, whether it would make it more unconstrained, independent decision to make statements. But the probable cause simply doesn't achieve that notion of intervening circumstances. Roberts, did you cover that in your reply brief, I guess? I did. Thank you. Mr. Taylor, thank you. The case just argued is submitted. Good morning.
judges: Silverman, Gould, Bea